[Civ. No. 19437. Fourth Dist., Div. Two. May 15, 1979.]

MICHAEL ROBERT KRAMER, Plaintiff, v.
CEDU FOUNDATION, INC., Defendant,
Cross-complainant and Appellant;
LOUIS C. REHM, Defendant, Cross-defendant and Appellant;
OHIO CASUALTY INSURANCE COMPANY,
Intervener and Respondent.

4

---

**COUNSEL**

Chase, Rotchford, Drukker & Bogust, E. Michael Kaiser and Toni Rae Bruno for Defendant, Cross-complainant and Appellant.

Cooksey, Coleman & Howard and Paul Cooksey for Defendant, Cross-defendant and Appellant.

Trout, Heggeness & Sweet, Clifford D. Sweet III, Terry Heggeness and David S. Bright for Intervener and Respondent.

Grancell, Kegel & Tobin, Clinton M. Hodges and John L. Maier as Amici Curiae on behalf of Intervener and Respondent.

## OPINION

**TAMURA, Acting P. J.**—These appeals involve two distinct problems: (1) A negligent employer's right to reimbursement of workers' compensation benefits in an employee's third party action and (2) an owner's right to be indemnified by a contractor employed to supervise a building project for liability resulting from an injury sustained by an employee of a subcontractor.

The background of these appeals is as follows:

Defendant Cedu Foundation, Inc. (Cedu), a nonprofit residential school for disturbed young people, contracted with Louis Rehm (Rehm) to supervise the construction of a training center—director's residence. Plaintiff, an employee of the drywall contractor on the project, fell from a ladder scaffold while working in the interior of the structure and sustained serious injuries.

The following litigation ensued: Plaintiff sued Cedu and Rehm for damages for the injuries he sustained; Ohio Casualty Insurance Company (Ohio), the workers' compensation carrier for plaintiff's employer, filed a complaint in intervention to recover workers' compensation benefits paid to plaintiff; and Cedu filed a cross-complaint for indemnity against Rehm. Jury trial resulted in verdicts in favor of plaintiff and Ohio against Cedu and Rehm and a verdict in favor of Rehm on the cross-complaint for indemnity. In special findings, the jury assessed plaintiff's total damages in the sum of $664,000 and apportioned negligence as follows: 19 percent to plaintiff, 19 percent to plaintiff's employer, 38 percent to Cedu, and 24 percent to Rehm. Judgment was entered in favor of plaintiff and against Cedu and Rehm in the sum of $498,150.

In calculating the amount of Ohio's judgment, the trial court determined that Ohio's claim should be reduced by the amount of negligence attributed to plaintiff and his employer. Since Ohio had paid $49,621.45 in workers' compensation benefits to and for the benefit of plaintiff, the court reduced that amount by the percentage of negligence attributed to plaintiff and his employer and entered judgment for Ohio in the sum of $30,745.36.

Cedu and Rehm appealed from the judgment in favor of plaintiff and from the judgment in favor of Ohio. Cedu appealed from the judgment in favor of Rehm on the cross-complaint for indemnity. Pending the appeal,

Cedu settled with plaintiff and thereafter Rehm abandoned his appeal from that judgment.[1] Since the two pending appeals are essentially unrelated both as to facts and issues, they will be treated separately.

I

### REIMBURSEMENT OF WORKERS' COMPENSATION BENEFITS

The sole issue on the appeal from the judgment in favor of the workers' compensation carrier for plaintiff's employer is the proper method of determining the amount of reimbursement of workers' compensation benefits to which a negligent employer is entitled in an action against a third party tortfeasor. As has been noted, the trial court arrived at that amount by reducing the carrier's claim for benefits paid by the percentages of negligence attributed to the employee and his employer.

Cedu and Rehm contend that the correct application of the comparative fault principle enunciated in *Li* (*Li* v. *Yellow Cab Co.,* 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]) to a *Witt* (*Witt* v. *Jackson,* 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641]) situation would be to permit reimbursement to the negligent employer only to the extent that its claim exceeds the proportional share of the total damages sustained by the employee attributed to the employer's negligence. In other words, in the case at bench it is urged that since the jury found that plaintiff's total damages amounted to $664,000 and since the employer was found to be 19 percent negligent, $125,100 of the total damages should be attributed to the employer's negligence. Cedu and Rehm contend that the employer or its carrier should be reimbursed only to the extent that the compensation benefits paid exceed that amount.

The approach advocated by Cedu and Rehm is the one adopted by the Court of Appeal in *Arbaugh* v. *Procter & Gamble Mfg. Co.,* 80 Cal.App.3d 500 [145 Cal.Rptr. 608] (hg. den.) decided during the pendency of this appeal. There, in an employee's action against the third party, the jury returned a plaintiff's verdict for $340,000. In special findings, the jury found that the employee was not negligent but that the employer and the third party were each 50 percent negligent. The intervener workers' compensation carrier had paid benefits totaling $44,836.17. The trial court

---

[1]Following Cedu's settlement with plaintiff, Rehm made a motion in this court to summarily reverse the judgment for plaintiff. The motion was calendared, heard and disposed of by a nonpublished opinion in which we denied Rehm's motion "without prejudice to litigation of the release issue in a proper forum following disposition of the appeal." (*Kramer* v. *Cedu Foundation, Inc.* (Dec. 26, 1978) 4 Civ. 19437.)

In view of Cedu's settlement and Rehm's abandonment of the appeal from the judgment in favor of plaintiff, the appeal from that judgment is ordered dismissed.

entered judgment for intervener for 50 percent of the amount or $22,918.09. On appeal, the reviewing court held that, consistent with *Li*, the all-or-nothing approach of *Witt* should be modified but that the approach taken by the trial court was wrong. The court held that the employer's compensation carrier should be reimbursed only to the extent that the workers' compensation benefits paid exceeded the proportional share of the total damages suffered by the employee attributable to the employer's negligence.

The principle enunciated in *Arbaugh* was approved by the Supreme Court in *Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.*, 22 Cal.3d 829 [150 Cal.Rptr. 888, 587 P.2d 684]. Although *Associated* involved an employer claiming credit under Labor Code section 3861[2] in the amount of the employee's settlement of a third party action, the court made it clear that the comparative fault principle should apply to a credit or reimbursement situation. In either case, the court concluded "that the concurrently negligent employer should receive either credit or reimbursement for the amount by which his compensation liability exceeds his proportional share of the injured employee's recovery. (See *Arbaugh* v. *Procter & Gamble Mfg. Co.* (1978) 80 Cal.App.3d 500, 508-509 [145 Cal.Rptr. 608].)" (*Id.*, at p. 842.) The court then proceeded to explain how the comparative fault principle should apply in the context of reimbursement and credit.

The court stated that when a negligent employer seeks reimbursement in a judicial forum, "application of comparative negligence principles is relatively straightforward. The third party tortfeasor should be allowed to plead the employer's negligence as a partial defense, in the manner of *Witt*. Once this issue is injected into the trial, the trier of fact should determine the employer's degree of fault according to the principles of *American Motorcycle*. The court should then deduct the employer's percentage share of the employee's total recovery from the third party's liability—up to the amount of the workers' compensation benefits assessed against the employer. Correspondingly, the employer should be denied any claim of reimbursement—or any lien under section 3856, subdivision (b)—to the extent that his contribution would then fall short

---

[2]Labor Code section 3861 provides: "The appeals board is empowered to and shall allow, as a credit to the employer to be applied against his liability for compensation, such amount of any recovery by the employee for his injury, either by settlement or after judgment, as has not theretofore been applied to the payment of expenses or attorneys' fees, pursuant to the provisions of Sections 3856, 3858, and 3860 of this code, or has not been applied to reimburse the employer."

of his percentage share of responsibility for the employee's total recovery." (*Id.,* at p. 842, fn. omitted.)

When the issue arises in the context of an employer's credit claim based on a third party settlement, the court stated that "the board must determine the appropriate contribution of the employer since the employee's recovery does not represent a judicial determination of tort damages. Specifically, the board must determine (1) the degree of fault of the employer, and (2) the total damages to which the employee is entitled. The board must then deny the employer credit until the ratio of his contribution to the employee's damages corresponds to his proportional share of fault. Once the employer's workers' compensation contribution reaches this level, he should be granted a credit for the full amount available under section 3861. Only when such level of contribution has been reached, however, will grant of the statutory credit adequately accommodate the principle that a negligent employer should not profit from his own wrong." (*Id.,* at p. 843, fn. omitted.)

The court concluded its opinion by stating "that the doctrines of *Roe* and *Witt* must be modified to reflect the principles of comparative negligence developed in *Li* and *American Motorcycle.* Thus, an employer may be allowed credit or reimbursement under the Labor Code, based on an employee's recovery from a third party, but only to the extent the employer's liability in workers' compensation exceeds its share of responsibility for the employee's full tort damages. When an employer claims a credit before the board after an employee's independent third party settlement, section 3861 operates as a delegation of authority to the board to make the necessary determinations to apply this rule. Any complication of board proceedings that may unavoidably result is justified by the same considerations of logic and justice that led us to apply comparative negligence in the first instance." (*Id.,* at pp. 846-847, fn. omitted.)

Amicus curiae California Workers' Compensation Institute implores us to treat *Associated*'s approval of the *Arbaugh* method of applying comparative fault principles in a *Witt* situation as dictum and to decline to follow *Arbaugh.* We read *Associated* as a square holding approving the *Arbaugh* rationale and extending it to the *Roe* situation. In footnote 12 of the *Associated* opinion, the court made it crystal clear that trial courts are to follow the *Arbaugh* rationale. The court directs that BAJI Nos. 15.14-15.19 (6th ed. 1977, pp. 668-691) "to the extent they are inconsistent with this opinion, should not be used by trial courts." (*Id.,* at p. 847, fn.

12.) The approach taken by the referenced BAJI instructions and comments was the one followed by the trial courts in *Arbaugh* and in the case at bench.

For the foregoing reasons, the judgment in favor of intervener Ohio Casualty Insurance Company must be reversed.

## II

### The Cross-Complaint for Indemnity

Cedu's cross-complaint for indemnity was tried to the jury along with the main action and resulted in a verdict in favor of Rehm. Cedu has appealed from the judgment on the jury verdict.[3]

■ Indemnity has been defined as the obligation resting on one party to make good a loss or damage another party has incurred. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.,* 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) In this state the obligation may arise from either of two general sources: "First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case." (*E. L. White, Inc.* v. *City of Huntington Beach,* 21 Cal.3d 497, 506-507 [146 Cal.Rptr. 614, 579 P.2d 505]; *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d 622, 628.) In the case at bench, there was no express contractual obligation to indemnify; the matter was submitted to the jury on the theory of equitable indemnity.

Cedu argues that it should have prevailed on the cross-complaint because the evidence established as a matter of law (1) that Cedu's liability was predicated on a derivative or vicarious liability for Rehm's negligence or (2) that Rehm was liable on an implied contractual indemnity theory because Cedu's negligence, if any, was passive whereas Rehm's negligence was active. We have concluded that the contentions lack merit.

---

[3]Although Cedu's appeal from the judgment was filed on October 3, 1977, the judgment on the cross-complaint was not entered until October 20, 1977. Nevertheless under rule 2 of the Rules on Appeal, the notice of appeal will be deemed to have been filed after entry of the judgment on the cross-complaint.

■ In stating the facts, Cedu ignores the established rules of appellate review that the evidence must be viewed in the light most favorable to the party prevailing below and that all conflicts in the evidence and all issues of credibility of witnesses must be resolved in favor of the prevailing party. (*Nestle* v. *City of Santa Monica,* 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]; *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].) Viewing the evidence in light of the foregoing principles, the salient facts may be summarized as follows:

The building being constructed for Cedu was primarily a residence for Mr. Wasserman, the president and executive director of the foundation. Cedu began work on the project itself but discovered that the work was more than it could handle alone. Rehm was a licensed general contractor. Cedu's general manager, Mr. Weiss, accepted the following contract proposal by Rehm: "I agree to furnish supervision as necessary to construct structure known as, Staff Training Center, & Directors Residence, for Cedu Foundation. [¶] Compensation shall be at the rate of One Thousand Six Hundred Dollars per month, for a minimum of Five and one half months, and a Maximum of Seven and one half months. Beginning date be considered December 15th, 1973. [¶] If structure is not complete at the end of the seven and one half month period, I furter [*sic*] agree to continue supervision until completion at no further cost to Cedu Foundation."

Under the agreement Rehm was to supervise construction, obtain bids from contractors and schedule the work. However, Rehm did not enter into any subcontracts; all contracts were executed by Mr. Weiss on behalf of Cedu. Cedu had two of its employees, Neil Weston and Richard Smith, serve as part of the construction management team. All materials required for the project were requisitioned through Rehm, Weston or Smith, and were obtained by Mr. Wasserman through donations or purchase. It was understood that Mr. Rehm would not be supervising construction activities during two days of the week (Tuesdays and Fridays) and that on the days of his absence either Weston or Smith would be in charge of construction activities.

On Rehm's recommendation, Mr. Weiss, on behalf of Cedu, entered into two separate letter agreements with Alfred J. Kephart for exterior and interior drywall work. On Friday, the day before the accident, Kephart's employee Perlatti erected the scaffold from which plaintiff fell. The scaffold consisted of a 2-inch by 14-inch board 12 feet long laid across a sawhorse on the mezzanine on one side and on an A-frame ladder on

the other side. The scaffolding was approximately 12 feet above the living room floor. Earlier in the week, Mr. Rehm saw the same or similar scaffolding, tested it and found it to be stable. The contract between Cedu and Kephart for the exterior work required Cedu to furnish the scaffolding but the contract for the interior work was silent on the subject. It was customary for drywall contractors to furnish scaffolding for all interior work.

Rehm did not remain on the premises on Friday and was not present on Saturday. Rehm had never been on the premises on any Saturday and this fact was known to Weiss. Rehm denied that Cedu had appointed him to be in charge of safety and testified that no one had been designated by Cedu to oversee the safety of the project.

Mr. Wasserman checked the building on almost a daily basis. It was understood that he had the right to discharge anyone working on the project, including Rehm, and had the right to tell Rehm what to do and how to do it. When Wasserman was gone, Weiss was in overall charge.

Kephart's crew worked in the building on Friday and some correctional work remained to be done on a chimney flue in an area some 12 feet above the living room floor. On Saturday morning, plaintiff and Perlatti had breakfast and met Harold Prestrud at the Sportsmen Club where they had beer. On the way to the job site, they bought a six-pack of beer and some brandy and upon arrival, plaintiff had at least one beer and Perlatti had some of the brandy. Plaintiff volunteered to do the work. He went up on the scaffold, completed part of the work and as he was returning to the other end of the scaffold for more material, he fell. Plaintiff had no recollection of the events of that day.

Wasserman was not on the premises but Weiss was in his office some 150 feet from the structure under construction. When Weiss arrived at the scene, he detected the odor of liquor on all three individuals. He told Perlatti and Prestrude that they were fired. Rehm never permitted drinking on the job and Cedu was very strict about not permitting drinking on the premises.

The jury verdict negates any implication that it found Cedu liable on the theory of derivative or vicarious liability for the negligence of Rehm. In finding in favor of plaintiff and against Cedu and Rehm, the jury assessed 38 percent negligence to Cedu and 24 percent to Rehm. The jury manifestly found that Cedu was concurrently negligent.

There was substantial evidence to support the finding of concurrent negligence. The relationship between Cedu and Rehm was not that of an owner and general contractor. Rehm was to provide supervision and advice but Cedu retained control over the work. Cedu executed all contracts, obtained materials, and had the power to discharge anyone working on the project, including Rehm. Although the evidence was conflicting, Rehm denied that he was in charge of safety on the project and testified that Cedu had not designated anyone to serve in that capacity. The evidence was uncontradicted that Rehm was not expected to be on the premises during two days of each week, that he had never been on the premises on Saturday, and that when Rehm was away one of Cedu's employees was to supervise construction activities.

An employer of an independent contractor who has reserved control over any part of the work may be liable for negligent failure to exercise such control or supervision. (See *Holman* v. *State of California,* 53 Cal.App.3d 317, 335 [124 Cal.Rptr. 773].) There was sufficient evidence from which the jury might reasonably infer that Cedu was negligent in failing to maintain adequate supervision over the safety of the construction activities. The contention that Cedu's liability was wholly derivative or vicarious, as a matter of law, lacks merit.

Equally untenable is Cedu's contention that it should have prevailed on the theory of implied contractual indemnity because it was, as a matter of law, only passively negligent at most.

Implied contractual indemnity is a form of equitable indemnity; it implies a contractual obligation to indemnify despite the absence of an express indemnity agreement where equitable considerations make it just to shift the loss to the other party. Consistent with Li, *American Motorcycle Assn.* v. *Superior Court,* 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], modified the all-or-nothing nature of the principle of equitable indemnity as followed in this state and placed it on a comparative fault basis. The court traced the history of equitable indemnity in California and recounted the futile attempts to formulate a fair and predictable rule for its application, including the characterization of the negligence of the parties as "active" and "primary" or "passive" and "secondary." The court concluded that the all-or-nothing approach precluded a fair apportionment of loss and that it should give way to a sharing of loss on a comparative fault basis. (*Id.,* at pp. 595-598.) In *E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d 497, 506-510, the court pointed out that parties were still free to formulate express contracts under which a

"passive" or even an "actively negligent" party would be completely indemnified. However, the court reaffirmed that in the absence of express contract, the *American Motorcycle* principles of implied equitable indemnity requiring apportionment according to comparative fault must be applied.

In the instant case, the parties introduced no evidence of an express indemnification contract. Consequently, in light of *American Motorcycle,* Cedu's attempt to shift the entire loss to Rehm on the theory of implied contractual indemnity must fail.

The judgment in favor of plaintiff in intervention Ohio Casualty Insurance Company is reversed.

The judgment in favor of Rehm on Cedu's cross-complaint for indemnity is affirmed.

McDaniel, J., and Morris, J., concurred.

A petition for a rehearing was denied June 4, 1979, and the petition of appellant Cedu Foundation, Inc., for a hearing by the Supreme Court was denied July 12, 1979.